AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Ohio



| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| IPHONE MODEL 1A522 IMEI 354386067449004; ZTE MODEL Z222 IMEI 869069024357852; IPHONE MODEL A1533 IMEI 0139670008743614; CURRENTLY LOCATED AT 1 DONHAM PLAZA, MIDDLETOWN, OH 45042 | ) |

Case No. 3:17 mj 199

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC § 1951(a) | Interference with commerce by threats or violence |
| 21 U.S.C. § 846 | Conspiracy |

The application is based on these facts:
See Attached Affidavit

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

SA Patrick Gragan, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 5-3-17

City and state: Dayton, Ohio

_____
*Judge's signature*

Sharon L. Ovington, Chief U.S. Magistrate Judge
*Printed name and title*

FILED RICHARD W. NAGEL CLERK OF COURT
2017 MAY -3 PM 3: 29
U.S. DISTRICT COURT SOUTHERN DIST. OHIO WESTERN DIV. DAYTON

## ATTACHMENT A

1.      The property to be searched are: an iPhone Model A1522, international mobile equipment identifier (IMEI) number 354386067449004, a ZTE Model 7222 IMEI 869069024357852, and an iPhone Model A1533 IMEI 0139670008743614, hereinafter the "Devices."  The Devices are currently located at the Middletown (Ohio) Police Department, 1 Donham Plaza, Middletown, Ohio 45042.

2.      This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

1.     All records on the Devices described in Attachment A that relate to violations of Title 18 U.S.C. § 1951(a) and Title 21 U.S.C. § 846 and involve **CALVIN CAVONTE TRIBBLE** and **SAVON DAVIS** since September 1, 2016 including:

     a.    Call histories, voicemails, contacts or other call logs relating to or concerning drug trafficking activity or the sale of illegal drugs including, but not limited to: drug quantities; drug prices; drop locations for money or narcotics; the location of stash houses or bank accounts; the identity or contact information for coconspirators; the purchase, possession or acquisition of assets such as cars, homes, or jewelry; directions to meeting locations; the possession or use of firearms, ammunition, or body armor; the destruction or concealment of evidence from law enforcement.

     b.    Call histories, voicemails, contacts or other call logs relating to or concerning robberies or pharmacies including, but not limited to: manner of conducting robberies; robbery notes; pharmacy locations; or pharmacy information.

     c.    Text messages, SMS, or other written communications concerning or relating to the trafficking or distribution of narcotics, including, but not limited to: lists of customers and related identifying information; drug quantities; drug prices; drop locations for money or narcotics; the location of stash houses or bank accounts; the identity or contact information for coconspirators; the purchase, possession or acquisition of assets such as cars, homes, or jewelry; directions to meeting locations; the possession or use of firearms, ammunition, or body armor; the

destruction or concealment of evidence from law enforcement; any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information).

d.  Text messages, SMS, or other written communications concerning or relating to robberies or pharmacies, including, but not limited to: manner of conducting robberies; robbery notes; pharmacy locations; pharmacy information; meeting locations; or the identity or contact information for coconspirators.

e.  Photographs, videos or other electronic media relating to or depicting the trafficking or distribution of illegal drugs, including, but not limited to:  firearms; bulk cash; illegal drugs; associates or other coconspirators; homes or potential stash houses.

f.  Photographs, videos or other electronic media relating to or depicting robberies or pharmacies, including, but not limited to: robbery notes; pharmaceutical bottles; layouts of pharmacies; or the interior/exterior of pharmacies.

g.  Any matter establishing indicia of ownership or use of the cellular telephones, including, but not limited to, photographs, videos, text messages, contacts, and call history.

h.  GPS history or applications that have map functions or provide driving directions, which may provide information relating to the location of meeting locations, pharmacies, stash houses, or the locations of conspirators.

       i.   all bank records, checks, credit card bills, account information, and other financial records.

2.      Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

IN THE MATTER OF THE SEARCH OF
IPHONE MODEL 1A522 IMEI
354386067449004; ZTE MODEL Z222 IMEI
869069024357852; IPHONE MODEL A1533
IMEI 0139670008743614; CURRENTLY
LOCATED AT 1 DONHAM PLAZA,
MIDDLETOWN, OH 45042

Case No. _____

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Patrick Gragan, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a search warrant authorizing the examination of property—an

electronic device—which is currently in law enforcement possession, and the extraction from

that property of electronically stored information described in Attachment B.

2.      Affiant is a Special Agent with the Federal Bureau of Investigation ("FBI"),

United States Department of Justice, Cincinnati Division. I have been employed as a Special

Agent with the FBI since May 2016. I have received training in national security and criminal

investigations, and have conducted investigations related to international terrorism and white

collar crimes for the past six months. I have also received training in the search of mobile phones

and other portable electronic devices. As part of these investigations, I have participated in

physical surveillance, records analysis, and have worked with informants who have provided

information and assistance on subjects of investigations. Prior to employment with the FBI, I was

a member of a Special Operations Team – Alpha with a U.S. Army Special Operations Group. As such, I received training and experience on the collection and exploitation of multiple cellular protocols used for voice, text, and data communications. Additionally, I received training and experience with the exploitation of mobile devices. Based on my training and experience, I am familiar with federal laws related to racketeering, and I am aware that it is a violation of federal law to: (a) in any way or degree obstruct, delay, or affect commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempt or conspire to do so, or commit or threaten physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of Title 18 U.S.C § 1951(a). Additionally, based on my training and experience, I am familiar with federal drug laws, and I am aware that it is a violation of federal law to: knowingly and intentionally conspire to possess with intent to distribute controlled substances in violation of 21 U.S.C. § 846.

3.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4.     The property to be searched is a iPhone Model A1522, international mobile equipment identifier (IMEI) number 354386067449004, ZTE Model 7222 IMEI 869069024357852; iPhone Model A1533 IMEI 0139670008743614, hereinafter the "Devices." The Devices are currently located at the Middletown (Ohio) Police Department, 1 Donham Plaza, Middletown, Ohio 45042.

5.     The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

2

**PROBABLE CAUSE**

6.      The United States and multiple law enforcement agencies have been investigating a series of robberies with similar modus operandi at pharmacies that have been occurring throughout the Southern District of Ohio.  These robberies include the following:

a.   On October 1, 2016, at approximately 12:10 p.m., a similar attempted robbery occurred at CVS located at 4329 West Third Street, Dayton, Ohio.

b.   On November 2, 2016, at approximately 3:22 a.m., a similar robbery occurred at CVS located at 7470 Sawmill Road, Dublin, Ohio.

c.   On December 5, 2016, at approximately 10:41 p.m., a similar robbery occurred at CVS located at 1331 North Fairfield Road, Beavercreek, Ohio.

d.   On January 26, 2017, at approximately 8:30 p.m., a similar robbery occurred at Rite Aid located at 10 West National Road, Vandalia, Ohio.

e.   On February 9, 2017, at approximately 7:02 p.m., a similar robbery occurred at CVS located at 2372 Vine Street, Cincinnati, Ohio.

f.   On February 17, 2017, at approximately 10:30 p.m., a similar robbery occurred at CVS located at 590 Nilles Road, Fairfield, Ohio.

g.   On March 18, 2017, at approximately 12:19 a.m., a similar robbery occurred at CVS located at 2320 Boudinot Avenue, Cincinnati, Ohio.

h.   On March 23, 2017, at approximately 10:19 p.m., a similar robbery occurred at CVS located at 820 South Breiel Boulevard, Middletown, Ohio.

3

i. On March 28, 2017, at approximately 8:08 p.m., a similar robbery occurred at CVS located at 150 South Main Street, Franklin, Ohio.

j. On March 30, 2017, at approximately 10:09 p.m., a similar robbery occurred at CVS located at 28 Brookwood Avenue, Hamilton, Ohio.

k. On April 4, 2017, at approximately 12:07 a.m., a similar robbery occurred at CVS located at 820 South Breiel Boulevard, Middletown, Ohio.

l. On April 5, 2017, at approximately 10:03 p.m., a similar robbery occurred at CVS located at 17 William Howard Taft Road, Cincinnati, Ohio.

m. On April 5, 2017, at approximately 10:36 p.m., a similar robbery occurred at CVS located at 7410 Beechmont Avenue, Cincinnati, Ohio.

n. On April 9, 2017, at approximately 8:38 p.m., a similar robbery occurred at CVS located at 1331 North Fairfield Road, Beavercreek, Ohio.

o. On April 10, 2017, at approximately 1:03 a.m., a similar robbery occurred at CVS located at 17 William Howard Taft Road, Cincinnati, Ohio.

p. On April 12, 2017, at approximately 5:00 a.m., a similar robbery occurred at CVS located at 620 South Cleveland Avenue, Westerville, Ohio.

q. On April 15, 2017, at approximately 8:50 p.m., a similar robbery occurred at Walgreen's located at 2710 Salem Avenue, Dayton, Ohio.

r. On April 16, 2017, at approximately 1:00 p.m., a similar robbery occurred at CVS located at 4901 North Main Street, Dayton, Ohio.

4

s.  On April 18, 2017, at approximately 9:30 p.m., a similar robbery occurred at CVS located at 3 West Corry Street, Cincinnati, Ohio.

t.  On April 19, 2017, at approximately 12:22 p.m., a similar robbery occurred at CVS located at 820 South Breiel Boulevard, Middletown, Ohio.

7.  As noted above, a CVS Pharmacy located at 820 S. Breiel Blvd., Middletown, Ohio ("CVS") has been robbed multiple times in a similar manner: on March 23, 2017; on April 4, 2017; and on April 19, 2017.

8.  On April 18, 2017, at approximately 9:30 p.m., law enforcement was called to respond to 4211 Lewis Street in Middletown, Ohio in reference to a suspicious vehicle.  The suspicious vehicle collected a black male who had run out of the CVS located at 820 S. Breiel Blvd., Middletown, Ohio.

9.  Law enforcement went to CVS and spoke with the female duty cashier.  The duty cashier, who will be referred to for purposes of this Affidavit as "M.R.", advised that a black male wearing a light colored ball cap with what looked like a blue emblem in the center of the ball cap, a black sweatshirt or warm up shirt with a gray t-shirt underneath, and black jogging pants with a double white stripe down the side, came into the store.  She described the subject as having a thin build, but she was unsure of his height.  She advised that the subject entered as she was taking care of customers at the register.  He walked down the left side of the building towards the pharmacy.  She advised it looked like he was casing the pharmacy.  After taking care of her customer at the register, she asked him if he needed anything.  She said that it appeared as if she startled him when she spoke with him.  He told her that he was looking for some vinegar

5

for his girlfriend. She showed him where the vinegar was and he stated that was fine. She then went back up to the front register. She advised that he left very shortly after that, and as far as she knows, he did not buy anything or take anything.

10.     Law enforcement then responded to 4211 Lewis Street to speak with the person who had originally called law enforcement. A person who will be referred to for purposes of this Affidavit as "B.D." advised that a four-door silver Chrysler 300 pulled into the driveway of 4213 Lewis Street. She observed the driver as a young black male and a front passenger who she could not identify other than having long kinky bushy hair. B.D. advised she did speak with the driver who stated, "we're cool, ma'am" and advised they were just checking their GPS. B.D. then saw a black male running from the area of CVS towards the vehicle. The vehicle pulled into the roadway and the black male got into the rear passenger seat. The vehicle then left the area.

11.     On April 19, 2017, at approximately 12:22 p.m., law enforcement responded to CVS in reference to a robbery. Law enforcement entered the store and secured the premises. Law enforcement spoke with a person will be referred to for purposes of this Affidavit as "C.R.", the pharmacy clerk. She advised that the male subject who robbed the pharmacy was a slender man with tattoos on his neck and wearing a gray hoodie. She advised that he handed her a note and the note stated that this was a robbery. She advised that she then gave the note to the pharmacist who appeared to follow the instructions on the note and place some medication that was specifically identified in the note into a bag and gave the bag to the suspect.

12.     The pharmacist advised law enforcement that he did not put all the medication that the note specified into the bag, but only some. The pharmacist advised that he still had the

6

note that had been used.  The pharmacist advised he had put the note into a ziplock bag.  The pharmacist gave the bag and note to law enforcement.  The note stated, "This is an armed robbery.  If you love your life don't make any noise and follow these directions.  Fill two bags with …" and identified several different types of pharmaceutical drugs with specific types and milligrams.  The note requested a specific number of bottles of oxycodone/acetaminophen in varying milligram doses.

13.     Law enforcement spoke with four other witnesses, three of whom were customers.  One witness, who will be referred to for purposes of this Affidavit as "C.M.", identified the suspect as a black male, slender build, wearing a gray hoodie and a baseball cap.  The baseball cap had some reddish color to the bill area.  He further advised that the suspect was wearing some type of greenish colored pants.  One of the customers, who will be referred to for purposes of this Affidavit as "D.M.", advised that the suspect was a black male with a gray hoodie jacket and shoes that had green on the sides.  A third witness who was also a customer, who will be referred to for purposes of this Affidavit as "L.E.", advised that the suspect was a black male with a skinny build and wearing a gray hoddie jacket and greenish pants.  All three customer witnesses advised that the suspect did not say a word and handed the note to the pharmacy clerk.

14.     Law enforcement spoke with the fourth witness, who will be referred to for purposes of this Affidavit as "M.W.", who is a pharmacy tech.  She advised that she realized there was a robbery happening and grabbed her cell phone.  She ducked down in the pharmacy in between aisles and called the police.

15.    Law enforcement observed some surveillance video footage of the robbery. Based on the video, law enforcement was able to verify that the suspect came into CVS at approximately 12:16 p.m.  He walked to the pharmacy, stood by the pharmacy until a customer that was at the register cleared, then walked up to the pharmacy counter and handed the note by laying it down onto the counter.  C.R. then grabbed the note, read it and handed it to the pharmacist.  The pharmacist then gave the suspect a bag containing the items and the suspect then left the store.

16.    While some officers responded to CVS, other law enforcement officers were checking for robbery suspects in the area.  In the area of Roosevelt Blvd. and Bonita Dr. in Middletown (which is approximately 1-2 blocks from CVS), law enforcement observed a subject matching the description of the robbery suspect.  The subject was standing next to a four-door silver Chrysler ("VEHICLE").  At the time law enforcement first observed the VEHICLE, the trunk was open and the subject threw a white bag into the trunk and closed the trunk.  Law enforcement turned their car around and stopped the VEHICLE.  Law enforcement located three males within the VEHICLE.

17.    The subject, matching the description of the robbery suspect and wearing the same clothes as identified by the witnesses, was located in the back, driver side passenger seat. Law enforcement removed the individual and took him back to CVS.  Witnesses from the robbery identified that individual as the person they observed in the CVS passing the note and removing the bag.  That individual was later identified as **DAVIS**.

18.    The driver of the VEHICLE was later identified as **TRIBBLE**.  A 15 year-old juvenile was located in the front passenger seat of the VEHICLE.

8

19.     Law enforcement conducted a search of the VEHICLE.  Inside the VEHICLE, law enforcement located a note similar in content to the robbery note left at CVS as well as clothing and a hat that matched the description of the items worn during the incident from the night before.  In the trunk of the VEHICLE, law enforcement located a white bag.  In that bag were the pharmaceutical drugs that matched what had just been stolen during the robbery at CVS.  The pharmacist later verified that these were the same items he placed in the bag and gave to the robber.

20.     Law enforcement transported the juvenile, **TRIBBLE**, and **DAVIS** to the Middletown Police Department.  After being advised of their Miranda rights, each consented to be interviewed.  The juvenile, **TRIBBLE**, and **DAVIS** were interviewed individually.  The juvenile, **TRIBBLE**, and **DAVIS** each confessed to participating in the April 19, 2017 robbery at CVS.  Additionally, the juvenile, **TRIBBLE**, and **DAVIS** also confessed to participating in attempting a robbery at CVS on April 18, 2017.

21.     The Devices are currently in the lawful possession of the Middletown Police Department (MPD). They came into MPD's possession in the following way: seized incident to the arrest of **TRIBBLE** on April 19, 2017. Therefore, while MPD might already have all necessary authority to examine the Devices, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Devices will comply with the Fourth Amendment and other applicable laws.

22.     The Devices are currently in storage at 1 Donham Plaza, Middletown, Ohio 45042. In my training and experience, I know that the Devices have been stored in a manner in

which the contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of MPD.

## TECHNICAL TERMS

23.    Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records of the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations

11

involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.   PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

12

f.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

24.  Based on my training, experience, and research, I know that the Devices have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and may access the Internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

13

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

25.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the devices.  This information can sometimes be recovered with forensics tools.

26.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

    a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b.   Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

27.    *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

28.    *Manner of execution.*  Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

15

## CONCLUSION

29.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

## REQUEST FOR SEALING

30.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the warrant is relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that, online criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

Patrick Gragan
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on May 3, 2017:

Sharon L. Ovington
UNITED STATES MAGISTRATE JUDGE

16